**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| SEAN HARRIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AKORN, INC., JOHN N. KAPOOR, RONALD M. JOHNSON, STEVEN J. MEYER, BRIAN TAMBI, ALAN WEINSTEIN, KENNETH S. ABRAMOWITZ, ADRIENNE L. GRAVES, and TERRY A. RAPPUHN<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sean Harris ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Akorn, Inc., ("Akorn" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Akorn, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger between Akorn and Fresenius Kabi AG ("Fresenius Kabi").

2. On April 24, 2017, the Board approved the terms of and caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the

Company's shareholders will receive $34.00 in cash for each share of Akorn stock they own (the "Merger Consideration"). The total value of of the transacton is approximately $4.3 billion (the "Proposed Merger").

3. On May 22, 2017, the Board authorized the filing of a materially incomplete and false and/or misleading Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. In the Proxy, the Board set forth information on which it relied to recommend that Akorn shareholders vote in favor of the Proposed Merger.

4. Although Defendants represent in the Proxy that the Merger Consideration is fair to the Company's shareholders, they omitted certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and false and/or misleading, including information regarding the following: (i) the Company's internal financial projections; and (ii) the valuation analysis conducted by the Company's financial advisor, J.P. Morgan Securities LLC ("JPM"), in support of its opinion presented to and relied on by the Board that the Proposed Merger was fair to Akorn shareholders.

5. As alleged in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Akorn shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice. More specifically, Akorn is a corporation organized and existing under the laws of the State of Louisiana and the Individual Defendants are directors of a corporation organized and existing under the laws of the State of Louisiana.

8. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District, and (ii) Akorn is incorporated in this District.

## PARTIES

9. Plaintiff is, and at all relevant times has been, an Akorn shareholder.

10. Defendant Akorn is Louisiana corporation, with its principal place of business located at 1925 West Field Court, Suite 300, Lake Forest, Illinois 60045.

11. Individual Defendant John N. Kapoor ("Kapoor") has served as a the Chairman of the Board since 1990.

12. Individual Defendant Ronald M. Johnson ("Johnson") has served as a director of Akorn since May 2003.

13. Individual Defendant Steven J. Meyer ("Meyer") has served as a director of Akorn since June 2009.

14. Individual Defendant Brian Tambi ("Tambi") has served as a director of Akorn since June 2009.

15. Individual Defendant Alan Weinstein ("Weinstein") has served as a director of Akorn since July 2009.

16. Individual Defendant Kenneth S. Abramowitz ("Abramowitz") has served as a director of Akorn since May 2010.

17. Individual Defendant Adrienne L. Graves ("Graves") has served as a Chairman of the Board of Akorn since March 2012.

18. Individual Defendant Terry A. Rappuhn ("Rappuhn") has served as a director of Akorn since April 2015.

## CLASS ACTION ALLEGATIONS

19. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Akorn (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

20. This action is properly maintainable as a class action because:

    a. The Class is so numerous that joinder of all members is impracticable. As of April 21, 2017, there were approximately 124,533,605 shares of Akorn common shares outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of Akorn will be ascertained through discovery;

- 5 -

    b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

        i)    whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

        ii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

        iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

    c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

    d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

    e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.   A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.   The Proposed Merger**

21.   On April 24, 2017, Akorn and Fresenius Kabi issued a press release announcing the Proposed Merger, which states in pertinent part:

> LAKE ZURICH, Ill. and LAKE FOREST, Ill., April 24, 2017 – Fresenius Kabi has agreed to acquire Akorn (NASDAQ: AKRX), a U.S-based manufacturer and marketer of prescription and over-the-counter pharmaceutical products, for approximately $4.3 billion, or $34.00 a share, plus the assumption of approximately $450 million of debt1. The transaction is expected to close by early 2018 and to be accretive in 2018 to Fresenius Group net income and EPS, excluding integration costs.
>
> The agreement and transaction have been approved by the boards of both companies and will be recommended by Akorn's board to its shareholders. Akorn's largest shareholder has committed to supporting the transaction. The transaction is subject to approval by Akorn shareholders and other customary closing conditions, including regulatory review under the Hart-Scott-Rodino Antitrust Improvements Act.
>
> "Joining our two companies and product portfolios will strengthen and diversify both businesses," said John Ducker, president and CEO of Fresenius Kabi USA. "Akorn brings to Fresenius Kabi specialized expertise in development, manufacturing and marketing of alternate dosage forms, as well as access to new customer segments like retail, ophthalmology and veterinary practices. Its pipeline is also impressive, with approximately 85 ANDAs filed and pending with the FDA and dozens more in development."
>
> "Fresenius Kabi is an excellent fit for Akorn, strategically and culturally," said Raj Rai, Akorn's Chief Executive Officer. "Fresenius brings to Akorn the strength and resources of a global leader with an experienced U.S. team and an outstanding record of growth and award-winning service in the United States. We look forward to working with Fresenius Kabi on this next phase of our growth.

When the transaction closes, we will strive to ensure a smooth transition for our employees and customers."

Akorn also announced today that based on a preliminary review of Q1 results, it is reaffirming its previously announced 2017 guidance, excluding any one-time costs related to the transaction with Fresenius Kabi.

Fresenius Kabi specializes in sterile injectable medicines. Akorn produces a diverse portfolio comprising sterile ophthalmics, topical creams, ointments and gels, oral liquids, otic solutions (for the ear), nasal sprays and respiratory drugs in addition to sterile injectables, which made up just 35% of Akorn sales last year.

Akorn products are sold in retail pharmacies (prescription and over-the-counter) and directly to physician and veterinary distributors, in addition to hospitals and clinics – virtually all in North America. Fresenius Kabi is a global health care company with a worldwide network for pharmaceutical and medical devices R&D, manufacturing, sourcing, sales and supply chain that will be a valuable resource to grow Akorn's portfolio in the U.S. and abroad.

II.  **The Merger Consideration Appears Inadequate in Light of Akorn's Recent Financial Performance and Growth Prospects**

22.  Akorn is a specialty generic pharmaceutical company that develops, manufactures and markets generic and branded prescription pharmaceuticals, as well as private-label over-the-counter ("OTC") consumer health products and animal health pharmaceuticals. The Company operates through two segments: (i) Prescription Pharmaceuticals, and (ii) Consumer Health. The Prescription Pharmaceuticals segment offers generic and branded prescription pharmaceuticals in various dosage forms, including sterile ophthalmics, injectables, and inhalants; and non-sterile oral liquids, topicals, nasal sprays, and otics. This segment's primary products include Atropine Sulfate Ophthalmic Solution; Clobetasol Propionate Cream And Ointment; Ephedrine Sulfate Injection; Lidocaine Ointment; Methylene Blue Injection; Myorisan soft gelatin capsules; Nembutal sodium solution; Phenylephrine Hydrochloride Ophthalmic Solution; and Zioptan tafluprost ophthalmic solution. The Consumer Health segment manufactures and markets OTC products for the treatment of dry eye under the TheraTears brand. It also markets other OTC

consumer health products, including Mag-Ox, a magnesium supplement; and the Diabetic Tussin line of cough and cold products. In addition, this segment offers a portfolio of animal health products, such as Anased and VetaKet veterinary sedatives; Tolazine and Yobine sedative reversing agents; and Butorphic, a pain reliever. The company was founded in 1971 and is headquartered in Lake Forest, Illinois. *See* www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=248256.

23. The Merger Consideration appears inadequate based on the Company's recent reported financial performance and certain Individual Defendant's own public statements regarding the Company's prospects for growth. Indeed, in the second fiscal quarter of 2016, the Company's reported EBITDA was $113 million in the second fiscal quarter of 2016, compared to $84 million in the second quarter 2015; adjusted EBITDA was $131 million compared to $97 million from the previous year. In an August 2016 earnings call with analysts, Raj Rai, the Company's Chief Executive Officer stated:

> I am pleased to announce our second quarter net revenues came in at a record $281 million and were in line with our expectations, and up 27% from the prior-year quarter. As anticipated, we saw a 5% sequential growth compared with the first quarter of 2016 due to growth from contract awards won earlier in the year and products launched so far in 2016.

24. Duane A. Portwood, the Company's Chief Financial Officer, expanded on Mr. Rai's comments later in that same call:

> The increase in revenue was driven by organic growth, with approximately two-thirds attributed to price and approximately one-third to increased volume. During the second quarter, we continue to be the sole supplier of ephedrine sulfate, which accounted for approximately 21% of our quarterly net revenue. Gross margin for the second quarter was 61.2%, compared to 58.1% for the prior-year quarter. The increase in the company's consolidated gross margin was principally due to favorable product mix.
>
> [. . .]
>
> We ended the quarter in a strong capital position, with $156 million of cash at June 30,

2016, compared to $346 million at December 31, 2015. As a reminder, in the first quarter of 2016, we made a debt prepayment of $200 million.

25.     This trend continued through 2016 and culminated with the year-end financial results of a 13% increase in revenues, a 20% increase in diluted earnings per share ("EPS") and an 11% increase in adjusted diluted EPS. *See* www.sec.gov/Archives/edgar/data/3116/00011718431 7001235/exh_991.htm.

26.     In sum, based on Defendants own public filings with the SEC, Akorn appears to be well-positioned for significant financial growth, and the Merger Consideration appears not to reflect this potential for growth and will not adequately compensate the Company's shareholders. Thus, it is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

**III.    The Materially Incomplete and Misleading Proxy**

27.     On May 22, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger and discloses the bases on which the Board relied to recommend and solicit votes in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

28. The Proxy fails to provide material information concerning the Company's financial projections. Specifically, the Proxy discloses projected non-GAAP (generally accepted accounting principles) financial metrics, such as EBITDA and unlevered free cash flows, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

29. The Proxy discloses that the Board reviewed several sets of internal financial projections. The Company first prepared the "November 2016 Management Case" which were financial projections from the year 2017 through 2026. Those projections were then revised downward to reflect a lowered growth rate to projections for years 2022 through 2026 and undisclosed adjustments to EBITDA margin from the projected fiscal year 2020. These revised projections were called the "November 2016 Management Case Extrapolations."

30. The Proxy then discloses that in March 2017, revisions were made to the "November 2017 Management Case" even though there were no such set of financials disclosed in the Proxy. The Proxy must be corrected to clarify whether this term was made in error, and that the Proxy is referring to the November 2016 Management Case.

31. The March 2017 revisions incorporated the November 2016 Management Case projections for fiscal 2017 and 2018 through 2020, but went on to update and "refine" assumptions and estimates. The Proxy fails to disclose what refinements were made and their impact on the November 2016 Management Case through 2020. Then, for fiscal 2021 through 2026, the November 2016 Management Case projections were revised by "applying a growth rate determined based on a number of factors to the projected fiscal year 2020 revenue, which growth rate was then decreased year-over-year following fiscal year 2021, and by applying adjustments to EBITDA margin from the projected fiscal year 2020 based on the reasonable

judgment of management." These adjustments made to the fiscal 2021 through 2026 projections are called the "March 2017 Management Case Extrapolations" and the resulting forecasts are called the "Financial Forecasts". On information and belief, this amalgamation of seemingly unrelated assumptions and adjustments were incorporated to create a set of financial projections that would support the Board's decision to support the Proposed Merger and a fairness opinion. Indeed, the Proxy discloses that the March 2017 Management Case was not made available to Fresenius Kabi. However, Fresenius Kabi was provided information concerning assumptions and estimates to the November 2016 Management Case that would be changed to reflect information about recent developments used to prepare the March 2017 Management Case. Proxy, 47. However, that information is not disclosed in the Proxy for shareholders to consider.

32.     The Proxy appears to imply that the Board relied only on the March 2017 Management Case projections to recommend and solicit votes for the Proposed Merger, though that is not clear. The Proxy must be corrected to expressly disclose if the Board relied only on the March 2017 Management Case projections and must disclose specifically the refinements, adjustments and assumptions that were made to create the March 2017 Management Case projections.

33.     Furthermore, the March 2017 Management Case projections are materially false and/or misleading. The Proxy provides that the non-GAAP metric EBITDA was calculated based on net income before deducting projected (i) stock-based compensation expense; (ii) income tax expense; (iii) net interest expense; and (iv) depreciation and amortization expense. The failure to disclose this information renders the March 2017 Management Case projections contained on page 48 of the Proxy false and/or misleading especially in view of all the numerous customized "refinements," adjustments and assumptions that are reflected in the projections.

34. The Company's projected unlevered free cash flow ("UFCF"), a critical financial measure for shareholders to consider, also is false and/or misleading. The Proxy discloses that projected UFCF was calculated by taking into account "stock based compensation expense, less projected taxes, less capital expenditures, less (plus) increase (decrease) in net working capital", but none of these projected financial measures was disclosed. Proxy, 48.

35. When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

36. Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Akorn and Fresenius Kabi included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate

controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

37.     Throughout the last year, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

38.     At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculated the non-GAAP measures.  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading.  Indeed, the Defendants acknowledge that disclosing non-GAAP projections may mislead shareholders in the Proxy: "Due to the inherent limitations of non-GAAP financial measures, investors should consider non-GAAP measures only as a supplement to, not as a substitute for or as a superior measure to, measures of financial performance prepared in accordance with GAAP." Proxy, 46.

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

39. Moreover, the Defendants' stated reason in the Proxy for not reconciling the non-GAAP financial measure with GAAP financial measures, *i.e.,* based on the "unreasonable efforts" exemption found in Regulation G is absurd. Proxy, 48-49. First, while the list is long, the stated reasons are conclusory and insufficient to serve as the basis for failing to comply with Regulation G. Moreover, the Company regularly reconciles non-GAAP financial measures, including EBITDA, to GAAP net income in its quarterly earnings releases. Thus, for example, the disclosure that the Company cannot provide reconciliation because it does not have a reasonable basis to predict future stock based compensation awards is baseless. Indeed, the Company did forecast future SBC compensation expenses to calculate its projected EBITDA. *See* Proxy, 48, note 2.

40. The Proxy also omits certain key inputs necessary for shareholders to assess the valuation analysis performed by JPM in support of its fairness opinions, rendering the summary of such analysis in the Proxy incomplete and misleading.

41. With respect to JPM's Discounted Cash Flow Analysis, the Proxy fails to disclose the Company's projected net debt as of April 21, 2017. Net debt can show a company's ability to pay off its debts, and can be useful when assessing the business' financial stability. This information is material to Akorn shareholders, and its omission renders the summary of JPM's Discounted Cash Flow Analysis incomplete and misleading. Proxy, 44.

42. In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a

fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

43.  Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

44.  Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

45.  Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

46.  SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not*

*misleading.*" 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

47. The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

48. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analysis performed by the JPM, in support of its fairness opinions.

49. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

50. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information

identified above in connection with their decision to approve and recommend the Proposed Merger. Indeed, the Proxy states that JPM reviewed and discussed its financial analysis with the Board, and further states that the Board considered both the financial analysis provided by JPM as well as its fairness opinion and the assumptions made and matters considered in connection therewith.

51. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review JPM's analysis in connection with their receipt of the fairness opinion, question JPM as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

52. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

53. Akorn is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

54. The misrepresentations and omissions in the Proxy are material to Plaintiff and the

Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

55. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

56. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57. The Individual Defendants acted as controlling persons of Akorn within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Akorn, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

58. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

60. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

61. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

62. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

63. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and

certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C. Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 14, 2017

Respectfully submitted,

/s/ *Lewis S. Kahn*
Lewis Kahn, Esq. (23805)
Kahn Swick & Foti, LLC
206 Covington Street
Madisonville, La 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Attorneys for Plaintiff*

**FARUQI & FARUQI, LLP**
James M. Wilson, Jr. (*pro hac* forthcoming)
Nadeem Faruqi
685 Third Avenue, 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: nfaruqi@faruqilaw.com
jwilson@faruqilaw.com
*Attorneys for Plaintiff*